NOT DESIGNATED FOR PUBLICATION

No. 117,508

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JOSEPH R. SHEPACK,
*Appellee*,

v.

KANSAS DEPARTMENT OF REVENUE,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; TERESA L. WATSON, judge. Opinion filed May 25, 2018.
Affirmed.

*Ted E. Smith* and *J. Brian Cox*, deputy general counsel, of Legal Services Bureau, Kansas
Department of Revenue, for appellant.

*Douglas E. Wells*, of Topeka, for appellee.

Before BRUNS, P.J., HILL, J., and WALKER, S.J.

PER CURIAM: The Kansas Department of Revenue appeals a district court's
reversal of the administrative suspension of Joseph R. Shepack's driving privileges
because the arresting officer did not have probable cause to make an arrest. The court's
reasoning was straightforward. With no probable cause, it was an unlawful arrest. With
no lawful arrest, then, according to Kansas Supreme Court precedent, the implied consent
law does not apply and the arresting officer could not ask for an evidentiary breath-

alcohol test. Because we find the evidence supports the district court's holdings and its legal reasoning is sound, we affirm.

*A highway patrol dispatcher warns the trooper of erratic driving.*

On September 20, 2014, after receiving a report from the dispatcher that a pickup was driving erratically on the turnpike, a trooper spotted a truck matching the description pass by him when he was on the side of the road dealing with another car stop. His patrol car's emergency lights were activated while conducting this stop. The trooper noted that the passing truck did not move all the way into the far lane as required by law—instead, it straddled the line dividing the lanes. The trooper finished the stop and returned to his patrol vehicle so he could catch up to the white truck.

The trooper followed the truck for three to four miles and confirmed that the truck's tags matched those described by the dispatcher. The trooper noted the truck was driving below the 75-mile-per-hour speed limit. He saw the truck pass over the center line six times. Twice it straddled the center line for about 30 seconds. Finally, the trooper activated his emergency lights so he could stop the pickup. The truck continued on for about 30 seconds but eventually stopped near the South Topeka exit ramp.

We note two things. Shepack concedes that the trooper's initial stop was proper and the trooper stated there was nothing improper about the way Shepack parked on the shoulder. The trooper did later, however, state that parking near the exit ramp was a traffic hazard because of cars trying to exit.

When the trooper approached the truck he noticed a box in the truck bed that held six closed wine bottles and an empty box in the cab of the truck. When he reached the driver's side door, the trooper detected the odor of alcohol coming from the truck. He noticed that Shepack's eyes were bloodshot, watery, and glazed. When asked if he had

been drinking, Shepack responded that he had not. The trooper did not recall seeing Shepack fumble with his license and Shepack's speech was not slurred.

The trooper asked about Shepack's travel. Shepack responded that he was traveling from Wichita. At trial, Shepack admitted that this was not true. Shepack had driven from Ellsworth to Lawrence in the morning. He left Lawrence around 8 p.m. to drive to Wichita. Around milepost 147, his tire pressure light had come on. He exited the interstate to check his tire and then began to return to Topeka to fix the tire.

When the trooper asked Shepack to get out of his truck, he complied. When Shepack got out he dropped his turnpike toll ticket on the ground. The trooper told Shepack that he dropped the ticket and he might need it. Unassisted, Shepack picked up the ticket. When the trooper asked if he could see it, Shepack said no and put it in his pocket.

Next, the trooper told Shepack to move to the back of the truck. Shepack did not move, but he put his hands into his pockets instead. The trooper told Shepack to take his hands out of his pockets, and Shepack complied. The trooper told Shepack to move to the back of the truck a second time. Shepack did not comply and instead just stared at the trooper. The video recording of the encounter shows that Shepack asked the officer, "What do you want me to do?" At this point, the trooper grabbed Shepack by his arm and pulled him to the back of the truck while saying, "Come back here."

Shepack told the trooper to take his hands off him, and the trooper released him. The trooper then said that Shepack could either follow directions or go to jail. Shepack said that he would go to jail. At this point, the trooper handcuffed Shepack. Shepack did not resist being arrested, but he did firmly grasp the tailgate, which required the trooper to pull his hand back forcefully to handcuff him. The trooper did not ask Shepack to submit to a preliminary breath test or field sobriety tests before handcuffing him.

3

When the trooper moved Shepack to his patrol car, he asked Shepack how much of the wine he had drank that night. Shepack responded that he did not know what he was talking about. The trooper returned to the truck and searched it. He found a package of fish still cold to the touch from a Lawrence grocery store, thus showing that Shepack's statement that he was driving from Wichita was false.

After searching the truck, the trooper returned to the patrol car and asked Shepack to submit to a preliminary breath test and some field sobriety tests. Shepack said that he was not going to do any tests. The trooper took Shepack to a nearby highway patrol station where he read the implied consent advisory to him. Shepack stated that he would refuse to take the evidentiary breath test under certain Kansas caselaw that in his view invalidated the trooper's grounds for requesting the test. Shepack refused to initial the form which showed that he refused to take the test. In due course, the Department administratively suspended his driving privileges.

*Shepack takes the matter to the district court.*

After exhausting his administrative remedies, Shepack asked the district court to review the matter. The district court held an evidentiary hearing, where the trooper and Shepack both testified and the court watched the video recording of the encounter.

In its ruling, the district court addressed only one of Shepack's grounds for reversing the Department's decision. The court held that Shepack was arrested when he was first handcuffed at the back of the vehicle. The court ruled that to request a test under the implied consent law, the trooper needed probable cause to make a lawful arrest. The district court weighed all the facts available to the trooper at the time of the arrest and found insufficient probable cause for an arrest:

4

"Trooper Taylor witnessed Shepack fail to move entirely to the left lane when passing his lighted patrol vehicle on the shoulder. Trooper Taylor, when following Shepack, saw him drifting over the dotted line from the right to the left northbound lane several times. Trooper Taylor testified that he smelled the odor of alcohol on Shepack (though this box was not checked on the DC-27) and observed his bloodshot, watery, and glazed eyes. However, Shepack denied drinking. Trooper Taylor saw a box of wine bottles, but they were closed and in the back of the truck.

"Shepack parked his truck properly on the side of the road. He did not have slurred speech. He did not have balance problems, he did not have difficulty walking, and he did not lean on the truck for support. He dropped his toll ticket when getting out of the truck, but he had no difficulty picking it up. The fact that he put it in his pocket and would not show it to Trooper Taylor is no indication of being under the influence. Shepack's demeanor was calm and appeared, according to the DVD, to be cooperative.

"Under the totality of the circumstances present at the time of Shepack's arrest, the Court concludes that there was not probable cause to arrest him for driving under the influence."

With that conclusion, the court granted Shepack relief and reversed the Department's suspension of his license.

The Department brings this appeal, asking us to set reverse the court's ruling for at least two reasons. First, the Department argues the district court erred in determining that the trooper needed probable cause for DUI when he handcuffed Shepack. In its view, the trooper needed only probable cause that a crime (not necessarily DUI) had been committed by Shepack before his arrest. Since the evidence shows that Shepack had either disobeyed a lawful police order under K.S.A. 8-1503 or obstructed an investigation under K.S.A. 2017 Supp. 21-5904, the trooper had probable cause to arrest him. If probable cause existed for an arrest for these offenses, then the request to submit to an evidentiary breath-alcohol test was legally valid.

5

Contending that the district court incorrectly applied the evidence, the Department also argues that when Shepack was handcuffed, the trooper did have probable cause to arrest him for DUI.

*We list the rules that guide our review.*

Because the Department challenges the district court's factual conclusions as well as its legal conclusions, we have mixed questions of law and fact. For such questions we review the record to see if the factual conclusions are supported by substantial competent evidence and then with an unlimited review, we examine the court's legal conclusions drawn from those facts. See *State v. Hardy*, 305 Kan. 1001, 1012, 390 P.3d 30 (2017).

We turn now to the general topic of the law that applies to this case—the law of driving privileges. In general, under the Kansas implied consent law, any person who operates or attempts to operate a vehicle within the state is considered to have given consent to submit to one or more tests of the blood, breath, urine, or other bodily substances of that person to determine the presence of alcohol or drugs. See K.S.A. 2017 Supp. 8-1001(a).

Then, more specific to this appeal, K.S.A. 2017 Supp. 8-1001(b) speaks to reasonable grounds to believe that a person is DUI and one of two conditions exists:

> "A law enforcement officer shall request a person to submit to a test or tests deemed consented to under subsection (a): (1) If, at the time of the request, the officer has reasonable grounds to believe the person was operating or attempting to operate a vehicle while under the influence of alcohol or drugs, or both . . . and one of the following conditions exists: (A) The person has been arrested or otherwise taken into custody for any violation of any state statute, county resolution or city ordinance; or (B) the person has been involved in a vehicle accident or collision resulting in property damage or personal injury other than serious injury."

6

We note the two alternative conditions: either the person has been arrested or the person has been involved in a motor vehicle accident.

Here, there is no evidence of any vehicle accident or collision. This means that for the trooper to legally request the breath test he must:

- Have reasonable grounds to believe that Shepack was operating his vehicle under the influence; and
- Shepack must have been arrested. K.S.A. 2017 Supp. 8-1001(b).

As for the arrest provision, the Kansas Supreme Court has interpreted a substantially similar previous version of this statute to require that the arrest be lawful for a request under the implied consent statute to be valid. *Sloop v. Kansas Dept. of Revenue*, 296 Kan. 13, 17-20, 290 P.3d 555 (2012).

For a warrantless arrest to be a lawful arrest, it must be supported by probable cause. See K.S.A. 22-2401(c); *State v. Hill*, 281 Kan. 136, 141, 130 P.3d 1 (2006). Because the trooper here had no warrant for Shepack's arrest, the arrest must be supported by probable cause. The test for probable cause has been restated often. In *Sloop*, the Supreme Court settled on the following formulation:

> "'Probable cause is the reasonable belief that a specific crime has been or is being committed and that the defendant committed the crime. Existence of probable cause must be determined by consideration of the information and fair inferences therefrom, known to the officer at the time of the arrest. Probable cause is determined by evaluating the totality of the circumstances. As in other totality of the circumstances tests, there is no rigid application of factors and courts should not merely count the facts or factors that support one side of the determination or the other.' [Citations omitted.]" 296 Kan. at 20.

7

The court recognized that caselaw had tried to clarify that probable cause is a lower standard than the proof required for a criminal conviction or a civil judgment. *Sloop*, 296 Kan. at 20. In doing so, the following wording was added to the probable cause test:

> "'It is not necessary that the evidence relied upon establish guilt beyond a reasonable doubt. The evidence need not even prove that guilt is more probable than not. It is sufficient if the information leads a reasonable officer to believe that guilt is more than a possibility.' [Citations omitted.]" *Sloop*, 296 Kan. at 20 (quoting *Bruch v. Kansas Dept. of Revenue*, 282 Kan. 764, 775-76, 148 P.3d 538 [2006]).

The *Sloop* court specifically disavowed the use of the language, "[i]t is sufficient if the information leads a reasonable officer to believe that guilt is more than a mere possibility." See 296 Kan. 13, Syl. ¶ 4. The court found that this language had crept into our caselaw without explanation and had received undue consideration in the probable cause analysis. 296 Kan. at 21. Instead of the mere possibility language, our Supreme Court relied on United States Supreme Court precedent that stated: "'Probable cause exists where" 'the facts and circumstances within their [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed.'" *Draper v. United States*, 358 U.S. 307, 313, 79 S. Ct. 329, 3 L. Ed. 2d 327 (1959) (quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S. Ct. 280, 69 L. Ed. 543 [1925]). *Sloop*, 296 Kan. at 21.

Moving on in this line of reasoning, we note that whether an officer has probable cause to arrest a person is viewed objectively. In other words, the subjective intent of the officer does not affect the analysis. *Devenpeck v. Alford*, 543 U.S. 146, 152-55, 125 S. Ct. 588, 160 L. Ed. 2d 537 (2004).

8

*We review the circumstances of this arrest.*

The trooper testified that when he handcuffed Shepack, he was arresting him for DUI. To us, the Department shifts its position and argues instead that the trooper arrested him for disobeying a lawful order or for obstruction. This argument was made to the district court. The district court did not directly address this argument, but it focused instead on whether there was probable cause to arrest Shepack for DUI before he was handcuffed.

The United States Supreme Court has stated that the intentions of the arresting officer are irrelevant to whether probable cause to arrest a person exists. *Devenpeck*, 543 U.S. at 154-55. This principle was adopted by this court in *State v. Beltran*, 48 Kan. App. 2d 857, 859, 300 P.3d 92 (2013). When we apply the principles of the ruling in *Devenpeck* and *Beltran* to the current case, we must analyze whether the trooper had probable cause to arrest Shepack for *any crime* when he was handcuffed.

The timing of the arrest is important to our analysis. For the arrest to be valid, the officer must have probable cause based on the facts known at that time. *Bruch*, 282 Kan. at 775-76. An arrest occurs when a person is either physically restrained or submits to the custody of an officer to answer for the commission of a crime. *Hill*, 281 Kan. at 143; see K.S.A. 22-2405(1). When the trooper handcuffed Shepack, Shepack was physically restrained. This restraint means that Shepack was arrested at that time. Thus, when Shepack was handcuffed, the trooper needed facts sufficient to support probable cause for the arrest to be valid.

For its part, the Department contends that Shepack disobeyed a lawful order by not moving to the rear of his vehicle when the trooper ordered him to move. According to the Department, Shepack violated K.S.A. 8-1503 when he did not move. We are not persuaded that this is true.

9

Caselaw teaches us otherwise. Under the holding in *State v. Greene*, 5 Kan. App. 2d 698, 704-05, 623 P.2d 933 (1981), the purpose of K.S.A. 8-1503 is to ensure public compliance with orders that come from an officer's authority to regulate traffic. Thus, orders that do not concern the regulation of traffic are not criminalized under the statute.

When the trooper ordered Shepack to move to the back of his vehicle, he was not regulating or directing traffic; instead, he ordered him to do so for the trooper's and Shepack's safety. Shepack's failure to move to the back of the vehicle does not give probable cause to arrest under this theory because no facts would support a conclusion that Shepack disobeyed a lawful order related to the regulation or direction of traffic.

The Department vainly tries to transform the trooper's order into an order regulating traffic by merely citing K.S.A. 8-1571. This statute makes it illegal for a person to stand on the side of a controlled access highway, like the Kansas turnpike. See K.S.A. 8-1571(a)(1)(ix). But when the trooper ordered Shepack to move to the back of the vehicle, Shepack was only outside his vehicle because he complied with the trooper's order to get out of his pickup. It is not clear how the fact that Shepack was standing on the side of the road transforms the trooper's order into an order regulating traffic.

To the contrary, it seems that the Department is trying to establish probable cause of a criminal violation because Shepack complied with the trooper's order to get out of his vehicle. Under this theory, any time a driver complies with an officer's order to exit a vehicle while parked on a controlled access highway, the officer would have probable cause to arrest the driver. It means that if you comply with an officer's order, then the officer can arrest you for complying with his order. This is tantamount to an officer ordering a person to break the law. This result is not reasonable. Based on the evidence here, there is not a sufficient basis to conclude that the trooper had probable cause to believe that Shepack had violated K.S.A. 8-1503 or K.S.A. 8-1571.

Next, the Department argues the trooper had probable cause to believe that Shepack had violated K.S.A. 2017 Supp. 21-5904—interference with law enforcement—in many ways. First, it argues that Shepack violated subsection K.S.A. 2017 Supp. 21-5904 (a)(1)(C) when Shepack denied that he had been drinking. This subsection criminalizes "[f]alsely reporting to a law enforcement officer . . . any information, knowing that such information is false and intending to influence, impede or obstruct such officer's or agency's duty." K.S.A. 2017 Supp. 21-5904(a)(1)(C).

This statute does not apply here simply because by lying about his consumption of alcohol, Shepack is not "falsely reporting" information to the trooper.

We recognize that a panel of this court has held that lying to a police officer can be grounds for a conviction under this subsection, but this case is distinguishable. In *State v. Miller*, No. 113,595, 2016 WL 1079467 (Kan. App 2016) (unpublished opinion), the panel reversed the district court's grant of a motion to dismiss a charge of falsely reporting when the defendant falsely identified herself to the police trying to serve a warrant for her arrest. 2016 WL 1079467, at *1-2. Here, the facts are different in that the information the trooper requested was partially incriminating. K.S.A. 2017 Supp. 21-5904(a)(1)(C) should not be construed to penalize the avoidance of providing self-incriminating statements.

The Department goes on to argue that obstruction occurred in two ways—Shepack's refusal to turn over the turnpike ticket to the trooper and not immediately going to the rear of the vehicle. In its view, his actions violated subsection (a)(3) of the statute: "knowingly obstructing, resisting or opposing any person authorized by law to serve process in the service or execution or in the attempt to serve or execute any writ, warrant, process or order of a court, or in the discharge of any official duty." K.S.A. 2017 Supp. 21-5904(a)(3).

11

The Department's argument about the turnpike ticket is unpersuasive. Shepack dropped his turnpike ticket and the trooper requested to see it. Shepack refused to let him see the ticket. Basically, considering the Fourth Amendment to the United States Constitution, what occurred here was the trooper requesting consent for a warrantless search of Shepack's effects. A warrantless search under the Fourth Amendment is per se unreasonable. *State v. Baker*, 306 Kan. 585, 589-90, 395 P.3d 422 (2017). The search may be permitted if an exception exists, but the Department argues no exception to the warrant requirement exists. See 306 Kan. at 589-90.

We do acknowledge that Kansas caselaw shows it may be obstruction, in some circumstances, to interfere with a search that had been consented to or was subject to a valid search warrant. *State v. Ryce*, 303 Kan. 899, 918, 368 P.3d 342 (2016), *aff'd on reh'g* 306 Kan. 682, 396 P.3d 711 (2017). But there is no evidence here that Shepack interfered with a search he consented to or a search authorized by a warrant. We find no caselaw that supports a conclusion that a person commits obstruction by refusing to consent to a warrantless search. Such a holding goes against the core principles of the Fourth Amendment. Simply put, the trooper did not have probable cause to arrest Shepack based on Shepack's refusal to allow him to see the toll ticket.

Next, the fact that Shepack did not move to the rear of the vehicle does not give probable cause to believe that obstruction of an official duty had been committed. For traffic stops, Kansas courts have found obstruction of an official duty has occurred when a suspect provided a false identification to police officers. See *State v. Latimer*, 9 Kan. App. 2d 728, 733, 687 P.2d 648 (1984). Even so, more recently this court has found that even providing false identification does not violate the obstruction statute when the providing of that information does not substantially hinder the investigation. For example, in *State v. Everest*, 45 Kan. App. 2d 923, 929, 256 P.3d 890 (2011), there was no criminal violation because the identity of the driver was quickly established by discovering identification documents. In *State v. Brown*, 305 Kan. 674, 690, 387 P.3d 835

12

(2017), our Supreme Court reaffirmed the requirement that for a violation of K.S.A. 2017 Supp. 21-5904(a)(3) to occur, the obstruction must cause a substantial hindrance or increase the burden on the officer.

In our view, Shepack did not substantially hinder the trooper's investigation or official duties. While not moving immediately did pose some safety risks, Shepack moved when the officer took his arm and escorted him to the back of the vehicle. The entire exchange from the trooper's initial request until Shepack had moved took about 30 seconds. The Department does not show how a reasonable officer would believe this was a substantial hindrance and thus obstruction.

The potential non-DUI criminal violations that the Department argues establish probable cause to arrest Shepack do not, in fact, establish a reasonable belief that he had committed or was committing a crime. Thus, the only remaining source of a valid arrest would be probable cause that Shepack was DUI.

*We agree with the court—there was no probable cause to arrest for DUI.*

In its thorough and well-written memorandum decision, the district court set out 27 paragraphs of facts. Both the transcript of the hearing and the video recording of the police encounter provide substantial competent evidence for each of the district court's findings.

The Department offers an argument that the court failed to give sufficient weight to some evidence or ignored other evidence. The Department argues that the district court erred by failing to consider fully:

- The extent of Shepack's erratic driving;
- Shepack stopped in a dangerous location near the exit of the turnpike;
- Shepack misrepresented his alcohol consumption;

13

- the late hour of the stop; and
- Shepack misconstrued where he was going.

The Department also argues the court misconstrued the evidence relating to Shepack dropping his toll ticket, his demeanor during the encounter, and his unimpaired balance.

When it focused on the extent of Shepack's erratic driving, the district court had to make a credibility determination. The State presented a sworn statement from a witness who allegedly observed Shepack driving erratically. To make its factual determination on how Shepack was driving, the court also considered the trooper's and Shepack's testimony and the video. In making the determination of fact, the district court seemingly did not find the sworn statement of the witness to be credible. We cannot reweigh that determination. See *State v. Hall*, 292 Kan. 841, 859, 257 P.3d 272 (2011). The district court's factual conclusion that the trooper received a call from dispatch about erratic driving and the trooper's observation of Shepack's driving before the stop are supported by substantial competent evidence. Thus, under our standard of review, it is not appropriate to consider the qualitative information in the witness' statement when deciding whether probable cause exists.

Similarly, the district court weighed evidence to reach the factual conclusion that there was nothing improper about the way Shepack had parked on the shoulder. The trooper provided conflicting testimony. First, he directly testified that there was nothing improper about the way Shepack had parked. Later, he stated that parking near the highway exit was dangerous. Based on the inconsistent testimony, the district court made a factual determination that Shepack had parked close to the exit, but he did not park in an otherwise deficient manner. Sufficient evidence supports this conclusion.

It is unclear how the Department concludes that there is a factual inconsistency over Shepack's consumption of alcohol and the misrepresentation of him consuming

14

alcohol. The district court addressed the fact that Shepack at first stated he had not consumed alcohol and then later testified that this was a misrepresentation of fact. The court noted that Shepack said he had consumed between four and seven glasses of wine on the day of the arrest. This factual conclusion is supported by the testimony from the hearing.

The Department also argues the court erred by not considering the time of day. Certainly driving at a late hour can be a factor a police officer relies on in determining whether probable cause exists to arrest a person for DUI. But the Department fails to show us how a stop at 9:27 p.m. qualifies as a late-hour stop. The caselaw the Department cites for support all involved stops after 1 a.m. See, e.g., *Kohn v. Kansas Dept. of Revenue*, No. 103,703, 2011 WL 768000, at *2 (Kan. App. 2011) (unpublished opinion). The Department provides no caselaw that supports a conclusion that a stop at 9:27 p.m. should be considered a late-hour stop to consider whether probable cause to arrest for DUI exists.

We turn now to Shepack misconstruing where he was going. The district court determined that at first, Shepack misrepresented to the trooper where he had been, but he later recanted these statements at trial—giving a complete itinerary of where he had been. Basically, the district court did not make the inference that the Department wanted it to draw from this information—that Shepack was confused about where he had been. The evidence supports the district court's conclusion. This was a deliberate misrepresentation and not the result of an alcohol-induced confusion. It was reasonable to reject the Department's requested inference from this information. We will not, on appeal, reweigh that evidence. See *Hall*, 292 Kan. at 859.

We next consider the Department's claim that the district court misconstrued the evidence. First, in its view, Shepack did not just drop his ticket, but he dropped the ticket because of a lack of manual dexterity. This was a result of alcohol consumption. This

15

position overstates the evidence available. The district court's conclusion that Shepack simply dropped the ticket is the only conclusion that could be drawn from the evidence presented. There was no testimony about where the ticket had been before being dropped. It is not clear from the video whether the ticket was ever directly in Shepack's hands at all. The only testimony relating to the ticket itself was that Shepack had dropped it. The determination that dropping the ticket showed Shepack lacked manual dexterity or concentration would not be supported by the evidence presented.

As for Shepack's demeanor, the district court held that Shepack was calm during the encounter. The video evidence supports this conclusion. Seemingly, the only time that Shepack raises his voice to the trooper is after he had begun escorting Shepack to the back of the vehicle. And we note that on the arrest report and alcohol/drug influence report, the trooper marked no boxes that showed Shepack was disorderly. The evidence supports a conclusion that Shepack was calm during the encounter.

The final contention over facts involves the district court's holding that Shepack did not have impaired balance. The video also shows that Shepack bent down to pick up his turnpike ticket off the ground without trouble. The trooper testified that Shepack did not lean up against any vehicle to maintain his balance during the encounter. The video supports this testimony. The district court's conclusion that Shepack did not have impaired balance is supported by the evidence.

All the factual conclusions the district court reached are supported by substantial competent evidence. Having resolved any questions over the factual determinations, we are left with a question of law—whether the facts known to the trooper at the time of the arrest supported probable cause to arrest for DUI.

Kansas caselaw provides no rigid test for what constitutes probable cause for DUI. Instead, each factual scenario must be considered on its own merits and be based on all

16

the facts and circumstances available to the officer. *Sloop*, 296 Kan. at 20-21. While there is no specific test, various cases have listed factors to consider in assessing whether probable cause to arrest for DUI exists.

We will consider only post-*Sloop* DUI cases. *Sloop* clarified the Kansas analytical test for probable cause. The language that probable cause could be found where guilt was more than a possibility was expressly disavowed as part of the Kansas probable cause analysis. Thus, cases that relied on that test, while not necessarily directly overturned, are of minimal precedential or persuasive value.

In *Sloop,* the court determined probable cause did not exist when an officer pulled a vehicle over for an improper tag light. Before beginning the stop, the officer followed the driver for 8 to 10 blocks without observing other driving concerns. After the stop, the driver's speech was not slurred, he did not fumble while presenting his license, and he did not stumble while exiting the vehicle or walking to the rear of the vehicle. 296 Kan. at 22-23.

Here, the facts are similar in some ways and different in others. Shepack did not fumble with his license, have slurred speech, or stumble in his movements—facts that support a conclusion that probable cause did not exist. But unlike *Sloop,* the trooper here followed Shepack for a few miles before beginning the traffic stop and observed him commit driving violations. Shepack's driving violations should be the focal point of the rest of the analysis because without the driving violations, this case would be controlled by *Sloop* and no probable cause would exist.

A more fitting case is *City of Wichita v. Molitor*, 301 Kan. 251, 341 P.3d 1275 (2015), because it provides a framework for assessing driving violations in a probable cause analysis for DUI. "Obviously, evidence of unsafe driving can suggest intoxication. But that alleged lapse of coordination must be viewed in conjunction with what

17

followed." 301 Kan. at 268. In *Molitor*, the driver committed a traffic violation by turning without signaling, ran into a curb while stopping his vehicle, and smelled of alcohol. The court held that there was no reasonable suspicion to arrest the driver because he presented his documents without trouble, did not have balance problems in moving around, and passed two field sobriety tests. 301 Kan. at 268.

Shepack provided evidence of intoxication by weaving in his lane several times. That evidence—along with the trooper noting the smell of alcohol and Shepack's bloodshot, watery, and glazed eyes—must be considered with the evidence that he was not having coordination problems after he exited the vehicle. See *Molitor*, 301 Kan. at 268. Shepack dropping his turnpike ticket provides little value about his state of coordination because there is not enough evidence to support the Department's contention that this showed a lack of manual dexterity. In contrast, Shepack bending over and retrieving the ticket from the ground with no balance problem is highly indicative that he was not intoxicated. Under the analysis in *Molitor*, the trooper did not have sufficient probable cause to arrest Shepack for DUI because his actions following the stop for the traffic infractions established that he was not intoxicated.

The two cases are not identical. In *Molitor*, the driver passed two field sobriety tests before being arrested. The facts that the driver passed these tests were included in the probable cause analysis. Here, there were no field sobriety tests conducted because the trooper handcuffed Shepack before requesting the tests.

Finally, the Department relies on *State v. Hamman*, 273 Kan. 89, 41 P.3d 809 (2002), to show what it believes is a factually similar scenario where probable cause was found to exist. In *Hamman*, a police officer observed a car driving 40 in a 55 mile-per-hour zone. The car was driving on the far right side of the lane and veered toward the centerline. The car continued to drift in the lane several times. Shortly thereafter, the car turned onto a gravel road. The officer saw the car cross over to the left side of the gravel

18

road and struggle to return to the correct lane. The car then slowed down, nearly to a stop. Next, the car continued driving slowly on the far right side of the lane. The car was not in the ditch along the road, but was close. The officer stopped the car and smelled alcohol after he approached the vehicle. The driving and the smell of alcohol provided probable cause to arrest for DUI. 273 Kan. at 95.

This case is distinguishable in two ways. First, *Molitor* requires that we consider the post-stop information about the lack of balance and slurred speech in our calculus of probable cause. 301 Kan. at 268. *Hamman* was decided before *Molitor*, and *Molitor* effectively altered the probable cause analysis from the analysis in *Hamman*. Second, the information on the driver's conduct in *Hamman* is much more indicative of intoxicated driving than Shepack's driving. Driving onto the wrong side of the road, struggling to return the car to the correct side of the road, almost completely stopping, and then continuing to drive slowly near the edge of the road is much more indicative of intoxicated driving when compared to Shepack drifting in his lane six times.

Considering all the facts available to the trooper *when he handcuffed Shepack*, we hold there was no probable cause to arrest him for DUI. While Shepack had shown some indications of intoxication by crossing the centerline several times and smelling of alcohol, those indications must be weighed against his lack of impaired balance and lack of slurred speech. The facts presented to the district court are insufficient. We hold the district court got it right.

Affirmed.