NOT DESIGNATED FOR PUBLICATION

No. 119,053

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CITY OF SALINA,
*Appellant*,

v.

SANDRA FAY DAHL,
*Appellee*.

MEMORANDUM OPINION

Appeal from Saline District Court; PATRICK H. THOMPSON, judge. Opinion filed December 21, 2018. Affirmed.

*Jeffrey A. Norris*, of Clark, Mize & Linville, Chartered, of Salina, for appellant.

*Roger D. Struble*, of Blackwell & Struble, LLC, of Salina, for appellee.

Before SCHROEDER, P.J., STANDRIDGE, J., and WALKER, S.J.

PER CURIAM:  The City of Salina (the City) files an interlocutory appeal challenging the district court's suppression of all evidence from the traffic stop of Sandra Fay Dahl. We agree with the district court and affirm.

FACTS

The City charged Dahl with driving under the influence of drugs and the municipal court found Dahl guilty. Dahl appealed to the district court and prior to trial moved the district court to suppress the evidence from the traffic stop, arguing the officer (1) exceeded the scope of a public safety stop; and (2) lacked probable cause to arrest her

1

for driving under the influence. The City responded (1) the officer had reasonable suspicion to conduct a *Terry* stop of Dahl's vehicle for operating a vehicle with a tire in an unsafe condition under K.S.A. 8-1742(e) or Salina City Code, Standard Traffic Ordinance, Art. 17 § 178(e); (2) the officer did not exceed the scope of a public safety stop; and (3) the officer had probable cause to arrest based on Dahl's performance on the standard field sobriety tests. At the suppression hearing, the City presented the following evidence.

Around 4 a.m. on August 1, 2016, Salina Police Officer Randy Constantino was sitting in his stationary patrol vehicle—running radar on passing cars—when he heard a clunking noise and saw a vehicle traveling northbound with a flat front passenger-side tire. Constantino followed the vehicle, which was not travelling with excessive or unusual speed, but the driver—later identified as Dahl, a 68-year-old woman—passed three areas where she could have pulled over. The traffic stop video showed, and the district court later found, the vehicle was visibly bouncing from side-to-side. But after Constantino activated his overhead lights, the vehicle stopped immediately and without incident.

At the hearing, Constantino explained he stopped the vehicle because he found it bizarre the driver would continue driving on a flat tire, to check on the driver's welfare, and to determine if the vehicle had been involved in a hit-and-run accident. Constantino initially stated a driver cannot operate a vehicle with a flat tire. On cross-examination, Constantino testified there is no traffic ordinance prohibiting drivers from operating a vehicle with a flat tire. He also testified a driver may operate the vehicle to remove it from the road and operating a vehicle with a flat tire can damage the road and put other drivers at risk.

After exiting his vehicle, Constantino asked Dahl whether she was unaware she had a flat tire as he walked to the driver's side door. When he made contact with Dahl, Constantino stated she seemed disoriented and confused and did not know she had a flat

2

tire. But he later admitted and the video of the stop confirms Dahl responded to his inquiry and stated she might have one but she was trying to get home.

Constantino then informed Dahl she could not drive on the flat tire and requested her driver's license and proof of insurance. After this request, Dahl tried to open her door which Constantino found odd because he did not ask Dahl to exit the vehicle. In the video, Dahl spoke to Constantino, but it is unclear what she said. Constantino told Dahl to stay in the vehicle and shut her door. He asked Dahl how much she had to drink, and Dahl responded she had had some water. Constantino told Dahl there was something going on with her because she was unaware of the flat tire and she tried to open her door for no reason.

Shortly after, Dahl handed Constantino an expired driver's license, but she gave him her current license after Constantino pointed out the first one was expired. Constantino stated Dahl had no trouble removing the licenses from her wallet. Constantino asked Dahl whether her address was correct, and Dahl answered in the affirmative and she was trying to get home. Constantino told Dahl she was not going to be able to get home. Constantino admitted Dahl was driving on a route to her home which was less than one mile from where he conducted the stop.

Constantino then asked for proof of insurance again. While waiting for Dahl to retrieve it, Constantino walked around the vehicle and inspected the front passenger side tire. Constantino admitted he requested the proof of insurance before he determined whether the vehicle collided with a structure or another vehicle. Constantino stated his visual inspection confirmed Dahl was not involved in an accident; but he observed damage to the fender, door trim, and hubcap. Constantino testified he also determined Dahl was impaired by alcohol or drugs at that time. Constantino returned to the driver's side window, asked Dahl to exit her vehicle, and intended to have Dahl perform the standard field sobriety tests. Constantino admitted he never asked whether Dahl had a

3

spare tire or how she planned to get home, and he never offered to call for roadside assistance or to offer other assistance as part of a public safety stop.

Upon exiting her vehicle, Dahl inspected the rear driver's side tire. Constantino informed Dahl her front passenger side tire was flat and allowed her to inspect the tire. Afterward, Constantino asked Dahl how much alcohol she had to drink that night and Dahl responded she had none. Constantino asked and Dahl denied taking prescription or illegal drugs. Dahl told Constantino she had gone to the bank to get money to pay rent, got a flat tire, and was trying to get home.

At the hearing, Constantino admitted he smelled no alcohol or an illegal drug odor during the stop and Dahl denied drinking alcohol and denied taking prescription or illegal drugs. Constantino stated indicators of impairment include: the look or appearance of the person's eyes, such as if the eyes are bloodshot or watery; the person's ability to track a stimulus; how the person's face looks; the person's communication, such as slurred, lethargic, or confused speech; and a person's movements based on the standard field sobriety tests. Constantino testified his training includes the identification of drug impairment and he had experience stopping drivers for driving under the influence of drugs. Constantino admitted he was not a drug recognition expert when he conducted the stop of Dahl's vehicle.

Constantino testified he determined Dahl was impaired by alcohol or drugs when he made contact with her based on her language, communication, and appearance. He stated Dahl was disoriented and confused because she did not know her tire was flat. He also stated Dahl responded or reacted slowly and exhibited odd behavior because her eyes appeared to look through him rather than at him, she continued driving on a flat tire, she tried to exit her vehicle without him asking her to exit, and she inspected the wrong tire upon exiting her vehicle.

4

At the hearing, Dahl's counsel interjected, before Constantino described her performance on the standard field sobriety tests, her motion only challenged whether the officer exceeded the scope of a public safety stop and conceded the probable cause issue. The district court held Dahl limited the suppression issue to whether the officer conducted a public safety stop or a traffic stop.

After the City's evidence, each party presented argument on whether Constantino exceeded the scope of a public safety stop. The City failed to present any argument on whether Constantino had reasonable suspicion to initiate a traffic stop. The district court granted Dahl's motion to suppress, holding Constantino conducted a public safety stop and exceeded the scope of the stop when he failed to take appropriate action to mitigate her peril or offer her assistance under *State v. Gonzales*, 36 Kan. App. 2d 446, 141 P.3d 501 (2006). In addition, the district court held the stop was not a traffic stop for a traffic infraction based on Constantino's statement no ordinance prohibited drivers from operating a vehicle with a flat tire.

ARGUMENT

The City argues the district court erred in suppressing the traffic stop because (1) the officer conducted a public safety stop and developed reasonable suspicion to morph the stop to investigate Dahl for driving under the influence; and (2) the officer conducted a valid *Terry* stop and had reasonable suspicion to extend the stop into an investigation for driving under the influence.

This court has jurisdiction over the City's interlocutory appeal under K.S.A. 2017 Supp. 22-3603 because the district court's suppression of the evidence substantially impairs the City's ability to prosecute Dahl for driving under the influence of alcohol or drugs in the district court. See *State v. Sales*, 290 Kan. 130, Syl. ¶¶ 4-5, 224 P.3d 546 (2010).

5

Our standard of review is as follows:

"'An appellate court generally reviews a trial court's decision on a motion to suppress using a bifurcated standard. The trial court's findings are first reviewed to determine whether they are supported by substantial competent evidence. Appellate courts do not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence. The ultimate legal conclusion regarding the suppression of evidence is then reviewed de novo. If the material facts in a trial court's decision on a motion to suppress evidence are not in dispute, the question of whether to suppress is a question of law over which an appellate court has unlimited review.' [Citation omitted.]" *State v. Patterson*, 304 Kan. 272, 274, 371 P.3d 893 (2016).

As part of our review, we also consider:

"[W]hen a law enforcement officer displays authority and restrains an individual's liberty by stopping a vehicle on a public roadway, constitutional issues arise because a seizure occurs within the meaning of the Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights, both of which protect individuals against unreasonable searches and seizures." *State v. Jones*, 300 Kan. 630, 637, 333 P.3d 886 (2014).

The State bears the burden to prove the legality of the seizure. K.S.A. 22-3216(2); *State v. Cleverly*, 305 Kan. 598, 605, 385 P.3d 512 (2016). Kansas courts first "determine whether a seizure has occurred by classifying the nature of the encounter between police and citizen." *State v. Reiss*, 299 Kan. 291, 297, 326 P.3d 367 (2014). There are four types of encounters: (1) consensual encounters; (2) investigatory detentions, or *Terry* stops based on the United States Supreme Court case, *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); (3) public safety stops; and (4) arrests. *Reiss*, 299 Kan. at 297.

6

The City argues the initial seizure of Dahl's vehicle was justified as a public safety stop and an investigatory detention or *Terry* stop. The City's burden differs under the two justifications. For public safety stops, the officer need not see a civil or criminal infraction to initiate the stop. *State v. Hanke*, 307 Kan. 823, 828, 415 P.3d 966 (2018); see *State v. Vistuba*, 251 Kan. 821, 824, 840 P.2d 511 (1992), *disapproved of on other grounds by State v. Field*, 252 Kan. 657, 847 P.2d 1280 (1993). "As the label implies, community caretaking or public safety reasons alone may justify such an encounter if the reasons are based on specific and articulable facts." *Hanke*, 307 Kan. at 827-28. For a *Terry* stop, however, an objective officer must know of specific and articulable facts amounting to a reasonable suspicion the seized individual is committing, has committed, or is about to commit a crime or traffic infraction. See 307 Kan. at 828; *Jones*, 300 Kan. at 637.

The two justifications also differ on how an officer's pretexual reasons affect the constitutionality of the stop. In *Terry* stops, "a traffic infraction provides an 'objectively valid reason to effectuate a traffic stop, even if the stop is pretextual.'" *State v. Garza*, 295 Kan. 326, 332, 286 P.3d 554 (2012). In contrast, Kansas courts have held in public safety stops "[t]he primary motivation . . . must be to effect community caretaking purposes. A public safety rationale cannot be utilized as a pretext for an investigative detention." *State v. Marx*, 289 Kan. 657, Syl. ¶ 3, 215 P.3d 601 (2009). Also, "a safety stop must be '"divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."'" *State v. Messner*, 55 Kan. App. 2d 630, 631, 419 P.3d 642 (2018). Thus, an officer may conduct a *Terry* stop with pretextual reasons but cannot do so for a public safety stop.

*This was a public safety stop.*

The City now argues the district court erred because the officer conducted a public safety stop that morphed into an investigatory detention for driving under the influence.

7

This court applies a three-part test to analyze the public safety stops:

> "First, the officer must have 'objective, specific, and articulable facts from which a law enforcement officer would suspect that a citizen is in need of help or is in peril.' The stop must be '"totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."' 'Second, the officer may take appropriate action to render assistance if the citizen is in need of aid.' Third, if the officer determines that the citizen is not in need of help, any actions beyond that constitute a seizure, implicating the protections provided by the Fourth Amendment. [Citations omitted.]" *Messner*, 55 Kan. App. 2d at 635.

See also *State v. Gonzales*, 36 Kan. App. 2d 446, 456, 141 P.3d 501 (2006) (quoting *State v. Lovegren*, 310 Mont. 358, 366, 51 P.3d 471 [2002]) (adopting three factor analysis).

The City meets the first step of the analysis because Constantino had specific and articulable facts to support a public safety stop. Constantino stated he heard a clunking noise and saw the vehicle travelling with a flat passenger-side tire. The district court found and the video shows Dahl's vehicle was visibly bouncing from side-to-side as she drove down the road. Thus, the factual circumstances support the district court's finding under the first step.

The district court held the officer exceeded the scope of a public safety stop because he immediately requested Dahl's driver's license and proof of insurance without taking appropriate action to provide her assistance or mitigate the peril in which he found Dahl. He never asked her any questions about a spare tire or offered to help her change the tire.

The district court relied on the *Gonzales* decision. There, while parked on the side of a highway, an officer saw a vehicle drive by with a bouncing rear tire. The officer followed the vehicle for about five miles without seeing any illegal activity, but he also

8

saw something sticking out from the side of the vehicle, which turned out to be an open fuel tank cover. The officer initiated a stop of the vehicle. On appeal, this court held the officer exceeded the scope of a public safety stop by asking about the vehicle ownership and retaining the occupants' driver's licenses. 36 Kan. App. 2d at 447-49, 456-57. Though the panel questioned the bouncing nature of the tire, the panel held the officer had specific and articulable facts to initiate a public safety stop. In *Gonzales*, the panel explained the officer's safety justification was "limited to an examination of the tire to determine if it was safe to continue driving and to alert the driver about the condition of the tire." 36 Kan. App. 2d at 457. The officer exceeded the scope of the stop because

> "[t]he trooper could have shut the hatch and examined the tire within a few minutes, thereby rendering assistance and mitigating the exposure of the occupants of the pickup to any peril. Then, having completed his public safety stop, the detention should have ceased. Instead of examining the tire immediately, Brockman began an investigative action immediately upon approaching the vehicle by asking about the ownership of the truck and asking for the occupants' driver's licenses." 36 Kan. App. 2d at 456.

The *Gonzalez* panel found the State presented no argument the officer had reasonable suspicion or probable cause to believe a crime had been committed. See 36 Kan. App. 2d at 457-58. The panel ultimately held that because a public safety stop is not for investigative purposes, the officer exceeded the scope of the stop. 36 Kan. App. 2d at 458.

This case presents similar circumstances to *Gonzales*. Here, Constantino determined Dahl's vehicle had some safety concerns before initiating the stop based on the clunking noise and what appeared to be a tire problem on the passenger side of the car. After stopping the vehicle, Constantino asked if Dahl was aware she had a flat tire and further informed Dahl she could not drive on the flat tire. Dahl answered she was and was trying to get home.

9

The factual circumstances presented here support the district court's finding Dahl required assistance, such as inquiring whether she had a spare tire, offering to change the flat tire, or calling for roadside assistance. Thus, the district court correctly found Constantino exceeded the scope of a public safety stop because he immediately shifted the purpose of the stop—within less than 30 seconds—away from addressing Dahl's need for help by asking for her driver's license and insurance card to begin his investigation for driving under the influence of alcohol or drugs.

With this conclusion, we find it unnecessary to address the City's other claims in detail that the stop was properly morphed into an investigative stop or a *Terry* stop. 392 U.S. at 1. In reviewing the totality of the circumstances in this case, the City failed to show an objective officer would have a reasonable and articulable suspicion—within less than 30 seconds—Dahl was driving under the influence of alcohol or drugs as the indicators he claimed and previously discussed fail to support starting an investigative detention at the time Dahl was seized.

The City also argues it was a valid *Terry* stop for a traffic offense or for criminal activity—leaving the scene of a hit and run accident. But the district court found Constantino testified he did not make the stop as a traffic stop and knew of no traffic offense for driving on a flat tire. Although the City argued the stop as a traffic infraction after the fact, that is not why the stop originally occurred. Additionally, the City argues a *Terry* stop was authorized to investigate whether the vehicle had been involved in a hit and run accident. The City failed in its written response to the motion to suppress or at the hearing to argue Constantino had reasonable suspicion to investigate whether Dahl had been involved in a hit and run accident. An issue not raised below cannot be raised on appeal. See *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014). The City further fails to explain why the issue should be considered for the first time on appeal. Our Supreme Court has cautioned that courts will strictly enforce Rule 6.02(a)(5) (2018 Kan. S. Ct. R. 34), and any litigant who fails to comply risks a ruling the issue will be deemed

waived and abandoned. *State v. Godfrey*, 301 Kan. 1041, 1044, 350 P.3d 1068 (2015). We deem the argument waived and abandoned.

Based on the totality of the circumstances and facts available to Constantino at the moment he stopped Dahl, no objectively reasonable officer would have specific and articulate facts to believe Dahl had committed or was committing a traffic offense when he testified he knew of no traffic offense she was committing. Likewise, he had no objectively reasonable and articulate facts to believe Dahl had been involved in a hit and run accident. All Constantino had was an inchoate and unparticularized suspicion Dahl's vehicle may have been involved in a hit and run accident. This was not a lawful *Terry* stop.

Affirmed.